IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| LEE TURNER, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )  Civil Action No.: 4:07-CV-1024-RBP |
| | ) |
| TENNESSEE ALUMINUM | ) |
| PROCESSORS, INC., | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION**

This cause comes on to be heard upon the Motion for Summary Judgment filed by Defendant Tennessee Aluminum Processors, Inc. (hereinafter "TAP") on March 3, 2008.

**FACTS**[1]

TAP is a recycler of aluminum products. It has owned and operated a smelting and processing facility in Gadsden, Alabama since the fall of 2000. There are approximately 80 to 90 persons employed at the Gadsden facility. Plaintiff Lee Turner ("Turner") was hired to work at TAP on November 24, 2000. He initially started working in the pit crew, but was soon promoted to operator due to his prior job experience.[2] As both a member of the pit crew and as an operator, Turner was paid an hourly wage and also received overtime compensation. In November 2002, Turner was offered a promotion to the foreman position. However, he turned down the job offer

---

[1] The facts, if disputed, are stated favorably to plaintiff based on his deposition.

[2] The organizational hierarchy in TAP's production department is as follows: pit crew, operator trainee, operator, foreman-trainee, foreman, assistant plant manager, plant manager. At all times relevant to this case, there was only one assistant plant manager at the Gadsden facility, Dewayne Baty. Likewise, there was only one plant manager, Dewayne Grooms.

1

because he "felt like [he] wasn't ready for it yet." Nearly two years later, Turner was named as a foreman. At TAP, employees who are accepted to try out for a foreman position must usually undergo a period of training time before they are fully placed in the job position. This period serves to train the employee in the job duties and skills necessary for a foreman, and serves to demonstrate to TAP that the employee can successfully accomplish the duties and goals associated with the foreman position. Foremen-trainees are also required to work with another full foreman, essentially being apprenticed in the position while they train. During this training time, foremen-trainees are paid an hourly wage and receive full overtime compensation. After the training period is completed, successful employees are made a full foreman. Plaintiff denies that he went through such a training period.[3] At the time, there was only one foreman per shift who was responsible for supervising every employee working in the furnace department. Based on this position, plaintiff was also eligible for bonuses, which foremen received at the highest pro rata share of any employee.[4]

Plaintiff claims that foremen are required to be at the plant thirty (30) minutes before their shift starts.[5] Foremen also routinely stay beyond their twelve (12) hour scheduled shifts to complete work orders.[6] While foremen are scheduled to work forty-eight (48) hours every eight days, plaintiff claims they work beyond their scheduled shift time almost every shift by up to one

---

[3] Plaintiff objects to the use of the term "salaried" on the grounds that his pay did not meet the Fair Labor Standards Act requirement that the pay is not subject to deductions. The court does not reach this issue. Its application is doubtful. For plaintiff's version of why and when he became salaried, see below.

[4] While plant managers, assistant plant managers, and crew are also eligible for bonuses, foremen receive the highest pro rata share based on their position.

[5] Defendant disputes that this was "required."

[6] Defendant claims that the foreman is charged with ensuring that their crews complete the shift's production work on time.

to three hours. Because he was the only foreman on his shift, plaintiff was the supervisor for as many as twelve (12) subordinate employees. On average, this included four to eight employees in the pit crew, four operators, and one employee working the industrial shredder. Defendant argues that Turner's main responsibility as foreman was to supervise other employees and oversee all of their job activities and production.[7] Plaintiff and all other foremen participated in a meeting in August 2006 where Dewayne Grooms stressed that a foreman must never leave his workforce unsupervised. Each foreman, including plaintiff, signed a document which stated, "[y]ou should never leave your people unattended, that's the whole reason you get paid." During nights and weekends, the plant manager and assistant plant manager were not present, making the foremen the highest level supervisors on site for those times. Plaintiff often worked these shifts.

There is a dispute as to whether plaintiff had the authority to hire and fire employees and/or to discipline employees under his supervision. TAP's policy requires foremen to strictly adhere to the discipline recommendations from the rule book. Plaintiff followed these guidelines and wrote up or gave verbal warnings to subordinate employees for various disciplinary violations. Turner signed the disciplinary forms and met with the employee to get the document signed as well.[8] See, however, his deposition version below.

One of the job duties of foremen is to perform chemical testing on samples of the aluminum alloy. This procedure involved "tapping" a small sample of the molten aluminum alloy from the furnace, placing it in a Spectrogram machine, running the test with a laser,

---

[7] While plaintiff concedes that he performed some supervisory functions, he disputes that this was his "main" or "primary" duty.

[8] The record is replete with documentary examples of Turner's roles in this regard.

obtaining the results, and interpreting the results.  Depending on the customer needs, the alloy testing needs to meet a certain percentage of aluminum, silicone, copper, iron, or steel.  Turner regularly interpreted the testing results and compared it with the customer standards to ensure that the metal composition matched the customer's needs.[9]  Turner also produced and maintained daily production sheets, which outlined the processing production of the furnaces.  Turner checked the aluminum alloy sows, compared them to the requirements on the production sheets, and checked off on their accuracy.  Turner also, along with the other foremen, maintained and used the Foreman's Log in the office.

Plaintiff's deposition includes the following questions and answers:

> A. They offered me a supervisor job, and I was –I felt like I wasn't ready for it yet.  So they moved me back down to operator for a moment.[10]
>
> Q Okay.  I guess at that time you had turned down the supervisor's job?
>
> A Yes.  They did away with the leadman position at that time.
>
> . . . .
>
> Q. Okay.  At some point though, you don't know when, but you were made a salary foreman; is that correct?
>
> A. Yes.
>
> Q. Were you told why you were switched from hourly to salary?
>
> A. I wasn't told, but I know why I was switched.

---

[9] Plaintiff argues that this process involves no discretion.  Instead, he claims that the chemical testing calls only for a predetermined response to a set of circumstances.  He suggests that seven out of every nine times, "shooting samples" requires no action by the foreman.

[10] This would suggest that the supervisor's job required more responsibilities.

Q.  Why were you switched?

A.  Because I started putting in more hours to match the guy that was making salary over me that had been there way less than me–time than me.

. . . .

A.  That because even after I become salary he still told me I wasn't a foreman. So how can I be, you know, not a foreman there then when I become salary still not a foreman.

Q.  What did he tell you you were?

A.  He told me I was basically still an operator.

Q.  Your job title on this is says foreman, though, right?

A.  That's what the title says.

Q.  Uh-huh (indicating yes).

A.  But he'd tell me different.

. . . .

Q.  *Is this job position, when you were moved from $11.20 and hour to salary, did the job duties change?*

A.  *No, still the same.*

Q.  What were your job duties generally?

A.  Come in, look at the stuff he got scheduled, got out there and locate the stuff and *basically operate*. He told me I was still an operator. *I loaded the furnace like an operator. My job was no different than an operator's*. (Emphasis added).

. . . .

5

Q. At the time when you were a foreman in the furnace department, you were over about 12 employees?

A. Yes.

. . . .

(When questions and answers related to hiring, the plaintiff emphasized that the plant manager Dewayne Grooms made the hiring decisions. The plaintiff's recommendations and references primarily related to his own relatives.)

Q. You never hired anybody on a weekend and told them that they had a job?

A. *No, they were–Dewayne hired everybody*.

Q. Okay. Did you ever look at applications on file and pick out somebody to hire?

A. No, I haven't.

Q. You never did that?

A. No. I have people bring applications in, and I give it to Dewayne. *As far as me looking at them and hiring them, no*. (Emphasis added).

Q. You didn't do anything else?

A. I *don't never hire–I never said yes and no. That's Dewayne's job*. (Emphasis added).

(As far as discipline, firing, etc., the plaintiff testified that he would simply pass on his observations of what had occurred to Grooms.)

. . . .

A. No. I would write them up as far as rule book, and Dewayne do discipline.

6

Q. Well, you wrote them up, right?

A. Yes.

. . . .

A. I *would write it up. When I write the write-up up, I put it on Dewayne's desk and Dewayne take it from there.*

Q. So you would never talk to an employee if they did something wrong?

A. If I see them doing something wrong, I would make mention of it and talk to them about it, *and I write it up and then we always put it on Dewayne's desk and he take care of it from there.*

Q. You would put the disciplinary form on his desk?

A. Yes.

Q. What happened to it then?

A. *He make the call on what happened. You know, I just go by what's in the rule book for what they done. I put it on his desk and he'll look at it, and, you know, they could* talk to them.

Q. But you would be the one to determine whether they violated the policy or not?

A. If I see somebody doing wrong, yes, I would make mention of it. (Emphasis added).

. . . .

Q. At nights wasn't the foreman the highest ranking person on-site?

A. Yes.

. . . .

7

> Q. Did you ever promote any workers from like Class B Operator to Class A, that type thing?
>
> A. No.
>
> Q. Nobody was ever promoted in your crew?
>
> A. People have been promoted but that wasn't my doing.
>
> Q. Did you come into work and find out somebody had been promoted without your knowledge?
>
> A. Yes.
>
> . . . .
>
> Q. As part of your job as supervisor, I guess you would have to supervise your employees, right?
>
> A. Uh-huh (indicating yes).
>
> Q. And what they did every day when they were working?
>
> A. Uh-huh (indicating yes).
>
> Q. You need to say yes or no.
>
> A. Yes.
>
> Q. Why would you have to supervise them? Just to make sure they did their job properly?
>
> A. No. Basically, he calls us supervisor operator. He call us operators. We just make sure they do the job like we would do it. *You know, show then and basically get out there and do it too*. (Emphasis added).
>
> . . . .
>
> Q. And your day was spend most of the day at the furnace watching the people work, right?
>
> A. *Out there working with them*. (Emphasis added).

8

>    (Plaintiff testified that there was some time that he was paid
>    overtime for working-extra days.)
>
>    Q.    Now, when you were on salary, you still got paid overtime
>          when you worked overtime, right?
>
>    A.    No. When I worked on my off day.
>
>    Q.    Yeah, yeah, if you worked something besides your
>          regularly-scheduled shifts?
>
>    A.    Yes.
>
>    Q.    You got paid for the time as overtime pay?
>
>    A.    Yes, yes.
>                    . . . .
>
>    A.    ...He just–like he told me the day I left there that I would
>          never be a true foreman.
>
>                    . . . .
>
>    Q.    As a foreman, were you effectively running a shift at night
>          then?
>
>    A.    Yes.
>
>    Q.    And on the weekends, I guess, too?
>
>    A.    Yes.
>
>                    . . . .
>
>    Q.    I understand they have–they are supposed to be held
>          accountable for their job, but as the supervisor you are
>          supposed to make sure they do their job correctly, right?
>
>    A.    Yes, yes.

. . . .

Q. Were you actually told that you would get paid for each hour you worked as opposed to getting a salary?

A. I wasn't told I was and I wasn't told I wasn't. They just took me off the clock to straight salary without my knowing where or when. All of a sudden, I get a check stub on salary.

Q. When you were placed on salary, you didn't know you were going to be placed on salary?

A. No, they actually surprised me before, you know, like I got a check stub for it and just seen it.

. . . .

Q. Operators work for you, though?

A. Yes.

. . . .

Q. Did Mr. Grooms ever say anything to you about not being a foreman or not really being a foreman?

A. Yes.

Q. Tell me what he said to you as best you can recall.

A. Tell me I'm not a true foreman. I'll never be a foreman. I'm just an operator. That's exactly what he said to me.

Q. And was that even after you had been promoted to the foreman position?

A. Yes, quite some time after.

. . . .

Q. Mr. Peak, when he was asking you a question, used the term in charge, that you were in charge of the employees

>   that worked the furnaces. Did you consider yourself in charge of those employees?
>
>   MR. PEAK: Object to the form.
>
> A.   *I don't feel like I am the way he told me I was nothing but an operator. A lot of times operators override me and go straight to Dewayne and he'll override whatever I say or anything.* (Emphasis added.)

### ARGUMENTS

There is no real dispute that the plaintiff was a supervisor of sorts. The real dispute is whether his supervisory function was his primary duty.

Defendant argues, and it is undisputed, that plaintiff was paid in excess of $455.00 per week.

Plaintiff makes a rather weak argument that the plaintiff cannot be an exempt employee because he does some blue collar work. The real issue is whether being a supervisor was his primary duty regardless of the nature of his non-exempt work. The plaintiff also makes an argument with regard to whether isolated deductions from his pay preclude an exempt status. The court does not reach that issue.

### CONCLUSIONS OF COURT

### SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party moving for

summary judgment bears the initial burden of explaining the basis of his motion. *Celotex,* 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell,* 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex,* 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

DISCUSSION

A statement of the plaintiff in his "Response to the Court's Requesting 'for' Additional Briefing on the Issue of Wage Comparison" filed on May 8, 2008 may well sum up, albeit questionably, the general problem with deciding FLSA cases. "[I]t is an incredibly subjective

determination to which *no uniformed, recognized standard exist* (sic). As such, there is no reasonable basis to believe that this issue can be decided as a matter of law. It is appropriately a fact issue that is to be determined by a jury." This suggests that juries are to subjectively establish their own standards. While this court does not accept this argument, it does illustrate the difficulty of applying the standards that do exist.

The standards that do exist are stated in various cases. In *Rodriquez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259 (11th Cir. 2008), the court applied the version of *29 C.F.R. § 541.1* in place in 2002. That version was somewhat revised in 2004. The case of *Jackson v. Jean Contu Group (PJC) USA, Inc., etc.* (S.D. Ga. 2007), 2007 WL 1850710 applied the revised regulations. The following statements in *Jackson* are pertinent:

> Under the FLSA, an employer must pay an employee overtime compensation unless that employee can be categorized as an "employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The employer carries the burden of proving applicability of the overtime pay exemption, and the overtime provisions are narrowly construed against the employer. Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir.2004) (citing Atlanta Prof'l Firefighters Union, Local 134 v. City of Atlanta, 920 F.2d 800, 804 (11th Cir.1991)).
>
> . . . .
>
> In order to meet the executive exemption under the new regulations, an employee must: (1) receive compensation on a salary basis at a rate of at least $455 per week; (2) manage the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof as her primary duty; (3) customarily and regularly direct the work of two or more other full-time employees; and (4) have the authority to hire or fire other employees or have particular weight given to their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status

of other employees. 29 C.F.R. § 541.100.[11]

. . . .

Under the regulations, "management" includes activities such as: interviewing, selecting and training employees, adjusting their hours of work, directing their work; maintaining production or sales records to use in supervision or control; appraising their work for the purpose of recommending promotions or other change in status; planning the work; handling employee complaints and grievances; apportioning work among employees, and providing for the safety of the employees and property. 29 C.F.R. § 541.102. The determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. 29 C.F.R. § 541.700(a).

Though a useful guide, the amount of time spent on managerial duties is only one factor to consider in identifying an employee's primary duty for purposes of determining whether the employee is subject to the FLSA's executive exemption from overtime pay requirements. *Ferrell v. Gwinnett County Bd. of Educ.,* 481 F.Supp.2d 1338, 1344 (N.D.Ga.2007). Generally, primary duty means that the employee is performing managerial duties during a major part, or over 50 percent, of the employee's time. *Jackson v. Advance Auto Parts, Inc.,* 362 F.Supp.2d 1323, 1333 (N.D.Ga.2005). "Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. § 541.700(b). Factors to be considered,

*4 include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

The court concludes as follows:

---

[11] (2) and (4) are the disputed areas.

14

1.  There is undisputed evidence that plaintiff received more than $455.00 per week designated as salary.

2.  It is undisputed that plaintiff supervised in excess of two employees.

3.  There is at least a question of fact as to whether plaintiff had the authority to hire or fire other employees or whether particular weight was given to his suggestions regarding personnel issues.

4.  There is at least a question of fact relating to plaintiff's role in interviewing, selecting and training employees; adjusting their hours of work; planning their work; handling employee complaints and grievances; apportioning the work of employees; and providing for the safety of employees.

5.  There is a question of fact as to the time plaintiff spend on allegedly exempt work.

6.  There is a question of fact as to how plaintiff's pay compared to that of clearly non-exempt employees.

7.  There is a question of fact as to whether supervision was plaintiff's primary duty.

The court ultimately concludes that the defendant's motion should be and will be denied.[12]

---

[12] The issue is very close and will have to be carefully considered at trial.

This the 22nd day of May, 2008.

_____
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**